**RASTEROPS, Plaintiff,**

v.

**RADIUS, INC., Defendant.**

**No. C–93–4162 SAW (WDB).**

United States District Court,
N.D. California.

Sept. 2, 1994.

David E. Monahan, John Allcock, and Timothy King of Gray, Cary, Ware & Freidenrich, San Diego, CA, for plaintiff.

David W. Slaby, Stuart P. Meyer, and Howard M. Freedland of Fenwick & West, Palo Alto, CA, for defendant.

## OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

BRAZIL, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiff RasterOps filed the above-captioned action on November 23, 1993, alleging that defendant Radius has infringed and continues to infringe RasterOps' patent rights in United States patent No. 5,229,852 (the " '852 patent").[1] RasterOps simultaneously filed an action against SuperMac, *RasterOps v. Su-*

perMac Technology, Inc., Civil Action No. 93–4161 WHO, alleging that SuperMac also infringed the '852 patent.[2]

RasterOps filed the instant motion for a preliminary injunction on April 14, 1994. Initially, RasterOps moved the court to "issue a preliminary injunction prohibiting defendant Radius from making, using or selling its VideoVision™ and VideoVision Studio™ products and any other products which infringes [sic] the claims" of the '852 patent. Memo. in Support of Motion for Preliminary Injunction, filed under seal April 14, 1994, at 23. In its reply papers (filed under seal July 29, 1994—one week before the hearing on the motion), however, RasterOps modified the scope of its motion, and at the hearing on the motion, counsel confirmed that for purposes of this motion, RasterOps alleges that only the VideoVision Studio™ products directly infringe the '852 patent. Accordingly, through this motion RasterOps seeks to enjoin (preliminarily) Radius from making, using, or selling only its VideoVision Studio™ product.

On August 5, 1994, the court received live testimony and documentary exhibits, viewed a demonstration by Radius, and entertained brief argument by counsel. On August 15, 1994, the parties submitted final written closing arguments. After carefully considering the parties' pre-hearing briefing (including numerous declarations and evidentiary exhibits), various deposition transcripts, the evidence and argument presented at the hearing, and the argument contained in the parties' post-hearing briefs, the court DENIES RasterOps' motion for a preliminary injunction for the reasons set forth in this Opinion and Order.

### II. LEGAL STANDARD

The issuance of a preliminary injunction under 35 U.S.C. § 283 (1988) is a matter

---

1. On April 8, 1994, pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties consented by stipulation and order to have the undersigned magistrate judge conduct all further proceedings in this case. *See* Order Transferring Case to Magistrate Brazil, filed April 20, 1994.

2. RasterOps and SuperMac settled that suit on March 18, 1994. Pursuant to their Settlement Agreement, SuperMac is to cease making, using,

or selling "any ... product which allows per-pixel masking of video data written into a frame buffer," by no later than September 30, 1994. Settlement Agreement at ¶.3 (Exh. 5 to Decl. of Paul J. Smith, executed April 14, 1994, filed under seal). In consideration for RasterOps' waiver and release, SuperMac also is obligated to pay RasterOps $60,000 in three equal installments. *Id.* at ¶.7.

committed to the sound discretion of the district court. The Federal Circuit, however, has consistently cautioned that because such relief is granted before the defendant has had an opportunity to fully defend itself at trial, "a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corporation v. ULSI System Technology, Inc.,* 995 F.2d 1566, 1568 (Fed.Cir.1993) (citing *Nutrition 21 v. United States,* 930 F.2d 867, 869 (Fed. Cir.1991); *Illinois Tool Works, Inc. v. Grip-Pak,* 906 F.2d 679, 683 (Fed.Cir.1990)).

In *Atlas Powder Company v. Ireco Chemicals,* the Federal Circuit also made clear that the burden on the party seeking a preliminary injunction in a patent case should not be greater than the burden imposed in other kinds of cases. 773 F.2d 1230, 1233 (Fed.Cir. 1985). That is, "[t]he grant of a preliminary injunction does not require that infringement be proved beyond all question, or that there be no evidence supporting the viewpoint of the alleged infringer. The grant turns on the likelihood that [the movant] will meet its burden at trial of proving infringement." *H.H. Robertson Company v. United Steel Deck, Inc.,* 820 F.2d 384, 390 (Fed.Cir.1987) (citing *Atlas Powder,* 773 F.2d at 1233, citation omitted).

[T]o obtain a preliminary injunction, pursuant to 35 U.S.C. § 283, a party must establish a right thereto in light of four factors: (1) reasonable likelihood of success on the merits; (2) irreparable harm; (3) the balance of hardships tipping in its favor; and (4) the impact of the injunction on the public interest.

*Hybritech, Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1451 & n. 5 (Fed.Cir.1988) ("*Abbott*") (also noting that the law of the Federal Circuit provides the standards governing the issuance of an injunction pursuant to § 283). Each factor must be considered and weighed against the other factors and against the form and magnitude of the relief requested. *Intel,* 995 F.2d at 1568 (citing *Abbott,* 849 F.2d at 1451).

In *Intel,* the Court of Appeals stated that "[a]lthough none of the four factors alone is dispositive, the absence of a sufficient showing with regard to any one factor *may,* in light of the weight assigned to the other factors, preclude preliminary injunctive relief." *Id.* at 1570 (citing *Chrysler Motors Corp. v. Auto Body Panels,* 908 F.2d 951, 953 (Fed.Cir.1990)) (emphasis added). In an opinion filed ten days after the hearing in the case at bar, however, the Court of Appeals apparently refined this relatively discretionary standard, plainly describing the mandatory nature of the movant's showing on the first two factors:

A movant seeking a preliminary injunction *must* establish a reasonable likelihood of success on the merits both with respect to validity and infringement of its patent. The movant *is also required* to establish that it will suffer irreparable harm if the preliminary injunction is not granted. Thus, a movant cannot be granted a preliminary injunction without findings by the district court that the movant carried its burden on *both* factors.

*Reebok International Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1555 (Fed.Cir.1994) (citing *Abbott,* 849 F.2d at 1451, 1456) (citations omitted, emphasis added).[3]

### A. Likelihood of Success on the Merits

▆ Because it is impossible to justify imposing an injunction (and the attendant economic harm) on a defendant who has not had the benefit of a trial without a showing that the defendant is likely to lose on the merits, the primary factor on which the court must concentrate is the likelihood of plaintiff's success on the merits at trial. "A reasonable likelihood of success requires a showing of validity and infringement." *Reebok International,* 32 F.3d at 1555 (citing *Abbott,* 849 F.2d at 1451). In assessing likelihood of success in these areas (as well as the area of enforceability, if put in issue) the court must bear in mind the location and magnitude of the burdens of proof at trial. *H.H. Robert-*

---

**3.** We note that as of the date of this Opinion and Order, the *Reebok International* opinion has not been released for publication in the permanent law reports. Until so released, that opinion is subject to revision or withdrawal.

*son,* 820 F.2d at 388; *New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878, 883 n. 4 (Fed.Cir.1992).

### 1. Infringement

■ At the preliminary injunction stage, a plaintiff must make a "clear showing" that it is "reasonably likely" at trial to meet its burden of proving infringement by a preponderance of the evidence. *Atlas Powder,* 773 F.2d at 1233; *H.H. Robertson,* 820 F.2d at 390 (sustaining district court's conclusion that there was a "reasonable probability" that the movant would meet its burden).

Infringement analysis is a two-step process. "Claim interpretation is the first step ..." *Miles Laboratories, Inc. v. Shandon, Inc.,* 997 F.2d 870, 876 (Fed.Cir.1993) (citing *Charles Greiner & Co. v. Mari–Med Mfg., Inc.,* 962 F.2d 1031, 1034 (Fed.Cir.1992)). "After interpreting the claim, the final step of the infringement analysis determines whether the accused device is within the scope of the claim. To infringe, an accused device must embody exactly each claim limitation or its equivalent." *Id.* (citing *Charles Greiner,* 962 F.2d at 1034, citation omitted).

■ The first requirement in claim interpretation is to examine the claim language. *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.,* 859 F.2d 878, 882 (Fed.Cir.1988). The terms of a claim will be given their ordinary meaning, unless it appears that the inventor used them differently. *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1579 (Fed.Cir.1988). Thus, in construing the claims at issue in this case, the court may properly look to the claim language, the specification,[4] the prosecution history,[5] the other claims, and expert testimony.[6] *SmithKline Diagnostics,* 859 F.2d at 882. The claims should be construed

as one skilled in the art would construe them. *Id.*

■ After carefully considering all the evidence and argument thus far presented, for reasons set forth in detail below, the court has concluded that there is a not inconsiderable prospect that there will be a finding at trial that persons skilled in the pertinent art would conclude that key passages of some elements of claims one and two of the '852 patent are infected with substantial ambiguity. That conclusion undermines appreciably the likelihood that plaintiff will prevail at trial on either the infringement or the validity issues.

The pertinent portions of the claims on which this discussion will focus include the following:

1. the part of claim one that reads: "non-interlaced raster frame buffer ... for **storing** the video signal at a second scan rate differing from the first scan rate;"

2. the part of claim two that reads: **"providing** the stored portion of **the video signal** *to* a frame buffer *at* a second scan rate differing from the first scan rate...."**

(Emphasis added.)

Plaintiff has conceded, in fact insisted, that the phrase "scan rate" can have several different meanings in settings like this. Plaintiff also has argued that the phrase "scan rate" as used in the above-quoted elements of claims one and two has a different meaning than that same phrase as used elsewhere in the patent. Moreover, plaintiff conceded, through unchallenged testimony by one of its own witnesses, that the definition plaintiff ascribes to "scan rate" in the above quoted parts of claims one and two is *not* the definition of that phrase that is most commonly

---

4. "[T]he specification aids in ascertaining the scope and meaning of the language employed in the claims inasmuch as words must be used in the same way in both the claims and the specification." *Autogiro Co. v. United States,* 384 F.2d 391, 181 Ct.Cl. 55 (1967), *quoted in ZMI Corp.,* 844 F.2d at 1580.

5. "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in or-

der to obtain claim allowance." *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir.1985), *quoted in ZMI Corp.,* 844 F.2d at 1580.

6. Expert testimony may be helpful as "evidence of construction of the claims as they would be construed by those skilled in the art." *McGill, Inc. v. John Zink Co.,* 736 F.2d 666, 675 (Fed.Cir. 1984).

used in settings like this. Tr. at I:33 (Michael Maietta). Rather, the most common definition is the definition that attaches to the phrase "scan rate" as that phrase is used in the parts of the patent that identify its central thrust and the principal purpose of the claimed invention as a whole. In those crucial, invention-defining contexts, the phrase "scan rate" refers to the speed at which a raster beam traverses or fills a screen or monitor. Tr. at I:33 (Mr. Maietta); Tr. at II:53–54 (Dr. Roy Murphy).

In the "Description of the Prior Art" in the "Background of the Invention" section of the '852 patent, the inventor offers the following information, apparently defining the crucial phrase "scan rate": "[I]n the prior art there is no true real time video conversion available that provides a digital output signal for use by a host computer and **to be displayed on a video monitor of a different scan rate, i.e., going from interlaced video to noninterlaced video."** (Emphasis added.) Significantly, the Abstract of the patent also uses the phrase "scan rate" with this same, most-commonly understood definition; the Abstract describes the claimed invention as: "[a] general purpose scan converter for converting video signals from one scan rate to another scan rate. The scan converter accepts ... inputs in standard video formats and convert [sic] them to be displayed on a monitor."

That same, most common definition also appears to attach to "scan rate" as that phrase is used in at least some parts of the "Detailed Description of the Invention." For example, in column six, at lines 58 to 65, the Description states:

- The size of pixel buffer 52 is determined by the difference between the absolutely lowest scan rate and the absolutely highest scan rate which must be dealt with. The larger this difference, the larger the size of pixel buffer 52 required. In accordance with one embodiment of the invention, pixel buffer 52 holds 64 pixels each of 24 bits *going from a scan rate of 15.734 KHz to one of 64 KHz.*

(Emphasis added.) This use of "scan rate" appears to refer to the speed at which a raster beam traverses a line or fills a frame on a monitor.

Plaintiff apparently takes the position that it is this same most common definition of the phrase "scan rate" that attaches to that phrase as it is used in the *first* two lines of claim one and the *first* two lines of claim two, the lines of the claims that fix their essential boundaries and define their center. The first two lines of the first claim read: "A converter for converting a video signal from a first to a second scan rate comprising:...." The first two lines of the second claim read: "A method of converting a scan rate of a video signal comprising the steps of...."

But plaintiff insists that this same phrase, "scan rate," is used with a *different, less common* definition in the two key (for our present purposes) elements of claims one and two. In those settings, plaintiff insists, "scan rate" really means the rate or speed at which *data flows or moves* first into and then, later, out of the pixel buffer (or into the pixel buffer and then, later, from the pixel buffer into the frame buffer).

Given the fact that the phrase "scan rate" is used not with this secondary meaning, but with the more commonly understood meaning (the rate or speed of the raster traversing or filling the screen) in those parts of the patent that identify its central thrust and that articulate the principal purpose of the claimed invention, one would expect the inventor and his agents to have **explicitly set forth** a second definition if they had actually intended to use this key phrase with a *different* meaning in some elements of some of the claims. But plaintiff has pointed to no such second definition in the patent documents. Nor has plaintiff presented persuasive testimony that persons skilled in the art would have understood, from the context or otherwise, that this key phrase was defined in some of the elements of claims one and two differently than it was defined in the Abstract, the Background of the Invention, or in the first clauses of those two claims. This failure by plaintiff to point to firm support, in text or context, for this second definition of "scan rate" is one troubling factor that buttresses the court's conclusion that it is likely that at trial there will be a finding that those

skilled in the art would find substantial ambiguity in this phrase as plaintiff has insisted it is used in the key disputed elements of claims one and two.

A close examination of the phraseology in some of the elements of claims one and two yields additional support for this conclusion. After announcing in its first lines that claim one involves a "converter for converting a video signal from a first to a second scan rate," the language of an important sub-element speaks of using a "frame buffer ... for *storing* the video signal *at a second scan rate differing from the first scan rate.*" (Emphasis added.) Similarly, elements of claim two speak of "*storing* a portion of the video signal which is at a first scan rate" and "providing the stored portion of the video signal to a frame buffer at a second scan rate...." (Emphasis added.) As plaintiff concedes (*see* Plaintiff's Closing Statement, filed under seal August 15, 1994, at 7), no one skilled in the art would argue that video signals are "stored" at any rate at all. As defendant has argued for some time, a video signal that is being stored in a frame buffer simply has no scan rate—it is static—so it is nonsensical to talk about "storing" such a signal at "different" "rates." Thus plaintiff has conceded, as it apparently must, that the language of the claims quoted in this paragraph, if taken literally, makes no sense. The fact that the language taken literally makes no sense would not be fatal, of course, if it were clear that persons skilled in the art would understand that the words do not mean what they say and that these elements of the claims have a non-literal meaning that would be both clear to persons skilled in the art and technologically significant. The court has concluded, however, that plaintiff's showings on these matters are not sufficiently persuasive.

While it seems likely that careful readers, skilled in the art, would understand that the subject language does not mean what it literally says, the court cannot conclude, on the record thus far developed, that such readers would construe these elements of the claims in the manner plaintiff construes them, or, if so construed, would find them technologically significant. Plaintiff, through Mr. Maietta

and others, insists that what is meant to be claimed in the subject parts of these elements is a device or process in which *data flows* into the pixel buffer *at one rate,* is stored in the pixel buffer, then is released from the pixel buffer to flow to the frame buffer—and that the *rate* or speed at which the *data flows* from the pixel buffer *to the frame buffer is different* from the rate at which the data entered the pixel buffer.

While this interpretation does less violence to the language of the claims as written than some alternative interpretations, plaintiff's contention that persons skilled in the art would adopt this interpretation is undercut by what the court perceives, at this juncture, as a serious shortfall in plaintiff's evidence: plaintiff presented no persuasive evidence that anyone skilled in the art would *care* about *these* relative rates. In other words, plaintiff failed to explain, meaningfully, *why it might be significant technologically* that the data flow rate into the pixel buffer be different from the data flow rate into the frame buffer.

Plaintiff did offer testimony that could be used to support a finding that, under certain conditions and over very short (but not necessarily *di minimis*) intervals, data could in fact be expected to move out of the pixel buffer at a different rate than data moving into the pixel buffer. But plaintiff's evidence was not sufficient to establish how often or what percentage of the time this data flow rate differential could be expected. More importantly, plaintiff's evidence was not sufficient to establish that persons skilled in the art would care whether there was a difference in these two data flow rates. The court finds itself, after considering all the evidence and argument, unable to answer with any substantial confidence the following questions: "What difference does any such data flow rate differential make?" "Was this alleged differential important to the PTO?" "Would persons skilled in the art understand this differential as making any significant contribution to the invention?" "Is it material to the invention?" "Does it in any technologically significant way help define what is inventive about the claimed invention?"

Plaintiff might attempt to respond to these questions by pointing out that under the system contemplated in the patent there would be short periods during which data would back up in the pixel buffer while the frame buffer was fully occupied by other tasks and thus shut off to incoming video data from the pixel buffer. The difficulty with any such response is that while the "Detailed Description of the Invention" clearly discloses that data could back up for short periods in the pixel buffer, that Description never even intimates that the invention responds to this foreseeable development by causing the data to leave the pixel buffer at a rate that is faster than the rate at which the data entered the pixel buffer. Instead, in at least two separate passages, the "Description" insists that back up of data in the pixel buffer

> is not a problem *because during conventional blanking at the end of each incoming video scan line, pixel buffer 4 will have ample time to unload its data to frame buffer 8.* If pixel buffer 4 is backed up to the point where it is not empty at the start of a new video scan line, control sequencer 14 clears the contents of pixel buffer 4 by providing a command on a reset (not shown) line (one of the Buf R/W lines 15).

Detailed Description, col. 4 (emphasis added). In another place the Description similarly asserts that "[d]uring the actual transaction period, pixel buffer 4 begins to back up with data. This is not a problem *because during video blanking pixel buffer 4 has ample time to empty.*" *Id.* (emphasis added). If the inventor really contemplated using a faster flow of data out of the pixel buffer to deal with the problem of data backing up in that buffer, these are the obvious passages where that solution would have been described. But these passages mention nothing about a faster data flow rate out of the pixel buffer. They mention nothing about different "scan rates" or about data flow rate differentials. Instead, they suggest that the potential problems caused by data backing up in the pixel buffer are solved by the availability of "ample time to empty" "during conventional blanking at the end of each incoming video scan line."

The doubts created by the Description's failure to mention data flow rate differentials are intensified by testimony from defendant's expert, Dr. Stephen Carr, to the effect that the rates of data flow into and out of the pixel buffer would in fact be essentially the same over any period of time that was significant in this context. Decl. of Dr. C. Stephen Carr, filed July 5, 1994, at ¶.20.B; Tr. at II:126–27. While plaintiff attempted to attack this testimony on cross-examination (Tr. at II:150–56), the court is not aware of any evidence that plaintiff offered that directly contradicted it, i.e., that purported to explain why any data flow rate differentials that might arise during very short periods were material to the invention.

In sum, plaintiff has not adduced substantial evidence that would support a finding that a person skilled in the art would ascribe significance to the fact that data might flow out of the pixel buffer at a faster rate than the data flowed into the pixel buffer. That failure is important—in part because it makes less persuasive plaintiff's contention that persons skilled in the art would understand the ambiguous language in the claims to mean what plaintiff now insists that language means.

Another consideration that undermines the persuasiveness of plaintiff's interpretation of these key elements of the claims is that there is an alternative interpretation of them that, while doing more violence to the inartful language as written, appears to be appreciably more consistent with the claimed invention as a whole. That alternative interpretation builds from the notion (driven by common sense and the failure of the patent to state otherwise) that the phrase "scan rate" is in fact used consistently throughout the patent—i.e., that each time it is used, it means the same thing. That single, uniform definition is the definition that plaintiff concedes is the most common—and the definition that is used in the Abstract, the Background of Invention section, and in the first two lines of claims one and two: namely, the rate or speed at which the raster beam traverses or fills a screen or monitor.

Moreover, there is evidentiary support for the view that the inventor in fact intended

the phrase "scan rate" to have this most common meaning even when it appeared in the disputed elements of claims one and two. This evidentiary support comes from the history of the prosecution of the patent as reflected in the file wrapper. The inventor's initial application was rejected by the PTO, in part because the examiner believed that claims one and two had been anticipated by a patent referred to as "Fernandez '257." Responding to this basis for the examiner's initial rejection, the inventor argued that what fundamentally distinguished the claimed invention from Fernandez was that "Fernandez's system, in contrast, does not convert the scan rate of the incoming video before sending the video data *to the display*." RS002737 (emphasis added). And it appears that a principal purpose of the amendments that the inventor added in response to the initial rejection of the claims was to reinforce the message that *that* scan rate conversion was central to the claimed invention and to refuting the notion that Fernandez '257 had anticipated Mr. Maietta's claimed invention. In the quoted material that follows, the portions that are underlined were added to the claims in response to the examiner's initial rejection:

1. (Amended) A converter for converting a video signal from a first to a second scan rate comprising:

a pixel buffer for storing a portion of the video signal having a first interlaced raster video scan rate;

an address generator for determining a display location for the video signal;

a non-interlaced raster frame buffer operatively connected to the pixel buffer for storing the video signal at a second scan rate differing from the first scan rate;

* * * * * * [subsequent elements of claim one also were amended, but those

amendments are not pertinent to this discussion]

2. (Amended) A method of converting a scan rate of a video signal comprising the steps of:

storing a portion of the video signal which is at a first scan rate;

providing the stored portion of the video signal to a frame buffer at a second scan rate differing from the first scan rate upon occurrence of a predetermined event;

* * * * * * [subsequent elements of claim two also were amended, but those amendments are not pertinent to this discussion]

(Underlines in original.)

The context in which these amendments were made appears to go a long way toward explaining what they mean. Central to that context was the inventor's insistence that a key distinction between his claimed invention and Fernandez '257 was the fact that "Fernandez's system ... does not convert the scan rate of the incoming video before sending the video data to the display." It appears that it was Mr. Maietta's perception that *that* scan rate conversion was pivotal to distinguishing his claimed invention from Fernandez '257 that inspired him to insert the repeated references to different "scan rates" in the language he used to amend claims one and two. Significantly, when he argued to the examiner how his claimed invention differed from Fernandez '257, Mr. Maietta never mentioned data flow rates at all. The arguments he made included no statement that the rate at which data flowed into the pixel buffer was different from the rate at which data flowed out of that buffer and into the frame buffer. If *that* alleged kind of "scan rate" differential had been important to defining his invention, Mr. Maietta presumably would have at least mentioned it. He didn't.[7] Thus, one quite plausible infer-

---

7. In explaining his decision to allow the amended claims, the examiner wrote: "The claims avoid the prior art of record in at least they recite *a storage means* by which the *scan rate of a video signal is* **converted and then stored** *within* windows of a *frame buffer* on a pixel by pixel basis wherein the windows may be of various selected sizes and shapes." RS002772 (emphasis added).

It is simply not clear what the examiner meant when he wrote this—or whether he in fact ascribed significance to the juncture at which the scan rate conversion occurred. It is noteworthy that one prior art (Smith, et al.) that he mentioned in the discussion that purported to explain his allowance decision disclosed a system "which includes a line buffer for receiving video data at

ence is that the awkwardness in the phraseology of these key new passages was attributable to constraints on the process of amending patent applications and to Mr. Maietta's desire to drive home his point that a central, defining feature of his claimed invention was that it converted the scan rate of the incoming video signal before sending that signal to the computer monitor (display). The plausibility of this inference weakens plaintiff's argument that these disputed passages in claims one and two really refer to different rates at which data flows into and out of the pixel buffer.

All this leaves the court with two important convictions. First, there is a very real prospect that after a full trial the court would conclude that persons skilled in the art would find the key passages of the disputed elements of claims one and two infected with substantial ambiguity. Second, though this conviction is somewhat less firmly held, it is likely that the court would find that the more compelling interpretation of the ambiguous language is not the interpretation urged by plaintiff but the interpretation suggested as more likely by defendant, namely, that the phrase "scan rate" as used in the key disputed passages refers to raster scan rate, not data flow rate.

Plaintiff seems to argue that it is likely to prove infringement regardless of which interpretation is accepted. The first important difficulty with that argument is that it conveniently end runs the first real hurdle that plaintiff will face at trial: the ambiguity in key passages of the claims. The magnitude and importance of that ambiguity, without more, must give rise to considerable uncertainty about whether the plaintiff will prevail on the merits of its infringement claim. Since the first necessary step in infringement analysis is interpreting the claims in the patent, it would seem to follow that a plaintiff that cannot show clearly what its patent's claims mean will have some difficulty proving infringement.[8]

But even if plaintiff is able to persuade the court that the phrase "scan rate" as used in the key passages of the disputed claims means data flow rate, plaintiff is by no means assured of proving infringement. As defendant has pointed out, plaintiff has adduced no evidence that any of its employees or experts has even attempted to measure and compare the pertinent data flow rates in defendant's allegedly infringing product. Thus plaintiff has adduced no direct evidence that in defendant's product the data flows into the pixel buffer at a different rate than data flows out of the pixel buffer and into the frame buffer. Plaintiff appears to rely, so far, on the suggestion that the structure of defendant's product is so similar to the structure of plaintiff's products that the data flow rates in defendant's product must be similar to the data flow rates in plaintiff's products, i.e., those products which embody the device de-

a [sic] interlaced rate and providing the data *to* a frame buffer at a non interlaced [sic] rate." RS002771 (emphasis added). Given his description of this prior art on the same page that he purported to explain his allowance decision in the sentence quoted above, it is difficult to understand how he could have ascribed much significance to the fact that rate conversion of some kind might occur prior to the data entering the frame buffer.

It is possible, but the court does not believe likely, that the examiner interpreted the phrase "scan rate" as it was used in the disputed elements of amended claims one and two to refer, as plaintiff insists, to rate of data flow into and out of the pixel buffer. That possibility arises primarily from the fact that it appears to make no sense to those skilled in the art to speak of "storing" this kind of data at any raster scan rate. But while we agree that it appears to make no sense to speak of storing this kind of data at

any *raster scan rate*, we fail to see why it makes any more sense to speak of "storing" this data at a *data flow rate*. Moreover, the court is troubled by the sloppiness of the examiner's writing and the apparently considerable conceptual imprecision in his reasoning. These considerations undermine the court's confidence in the reliability of the examiner's work and leave the court less inclined than it otherwise would be to invest substantial energy trying to divine what went through the examiner's mind.

8. Moreover, as discussed in the following section of this opinion, the real prospect that the court will conclude that the claims are infected with substantial ambiguity reduces appreciably the likelihood that plaintiff will be able to defeat defendant's challenge to the patent's validity. On this record, the court certainly cannot say that plaintiff has shown that the challenge to validity based on the ambiguity of key claims lacks substantial merit.

scribed in the '852 patent.[9] While this proposition might turn out to be persuasive at trial, the evidence in the current record leaves considerable room for doubt. Plaintiff introduced very little direct evidence about the details of the operation of defendant's product. In the absence of such evidence, there appears to be only a thin basis for inferring that there is in fact an appreciable difference in the rates at which data flows into and out of the pixel buffer in defendant's product. Moreover, defendant's expert testified that there is no meaningful difference in such rates over any periods of time that are of any consequence in this setting. Carr Decl. ¶.20.B., Tr. at II:126–27, 155–56. While it is possible, at trial, that such testimony could prove unpersuasive, it hardly seems fair, on this record, essentially to ignore this evidence at this juncture.

If, on the other hand, the court concludes at trial that the phrase "scan rate" as used in the key passages of the disputed elements of the claims means raster scan rate, plaintiff also faces serious obstacles in its effort to prove infringement. "To infringe, an accused device must embody exactly each claim limitation or its equivalent." *Miles Laboratories, supra.* In the case at bar, plaintiff's

claims, read literally, appear to contemplate conversion of the video signal to a raster scan rate that is appropriate for a computer monitor *before* the digitized video signal reaches the frame buffer.[10] The court is not aware, however, of any evidence in the record that would support a finding that conversion to the computer monitor scan rate occurs in defendant's product upstream of the frame buffer. The only evidence on this point indicates that this conversion occurs *within* the frame buffer. Carr Decl. at ¶.27; Tr. at II:128–31, 135. Given this state of the record, the court certainly cannot find that plaintiff has clearly shown that it is reasonably likely to prove that defendant's product infringes any of the claims of its patent, regardless of which interpretation of the phrase "scan rate" is adopted.

## 2. Validity

■ It is clear "that the [statutory—35 U.S.C. § 282] presumption [of validity] does not relieve a patentee who moves for a preliminary injunction from carrying the normal burden of demonstrating that it will likely succeed on all disputed liability issues at trial, even when the issue concerns the pat-

9. During the hearing, while struggling with the ambiguity of the term "scan rate," defense counsel asked Mr. Maietta questions about the RasterOps products that RasterOps claims are covered by the '852 patent. *See* Decl. of Michael Maietta, filed under seal April 14, 1994, at ¶.44 (listing plaintiff's products). When asked if in these products the "scan rate" (or data flow rate) at the output from the V–RAM remained the same as the "scan rate" (or data flow rate) at the input to the V–RAM, Mr. Maietta answered:

A. Yes, on some products it does.
Q. But on others it does not?
A. Yes, that's correct. It's not limited to being the exact scan rate or not.
Q. So there's a change in the scan rate between the input to the frame buffer and the output to the frame buffer on those products, correct?
A. On some of these, yes. If I may add, *the scan rates maybe [sic] similar from a scan rate standpoint. However, they may not be synchronized as we discussed earlier.*
Q. Mr. Maietta, isn't it true, nothing in the circuit before the frame buffer causes scan rate conversion?
A. Can you repeat that question?
Q. Isn't it true, that nothing upstream of the frame buffer causes scan rate conversion?

A. *That drawing there shows several scan rate conversions going on.*
Q. Several? Thank you.
Tr. at I:69–70 (emphasis added). We highlight this testimony as another troubling example of the confusion caused by the plaintiff's attempts to use the term "scan rate" in multiple ways. First, Mr. Maietta seems to distinguish between "common" scan rates (or scan rates from the "scan rate standpoint") and the different, potentially asynchronous "data flow rates" within the parts of a device. Then, he apparently goes on to talk about the latter as "scan rates," noting that a blow-up diagram of Figure 9 of the '852 Patent shows "several scan rate conversions going on" within that device.

We note that *nowhere* in the '852 patent are *several scan rate conversions* contemplated—either from a scan rate "standpoint" or a data flow rate "standpoint."

10. See, e.g., the element of claim one that refers to "a non-interlaced raster frame buffer ... for *storing* the video signal *at a second scan rate* differing from the first scan rate;" and the element of claim two that refers to "providing the *stored* portion of the video signal *to* a frame buffer *at a second scan rate* differing from the first scan rate". (Emphasis added.)

ent's validity." *New England Braiding,* 970 F.2d at 882 (citing *Nutrition 21,* 930 F.2d at 869). When validity has not already been litigated, and when an alleged infringer challenges the patent's validity with substantial evidence, "the patentee must show that the alleged infringer's defense lacks substantial merit." *Id.* at 883.

A claim in a patent that is insufficiently clear to put the world on notice as to its scope cannot be valid. 35 U.S.C. § 112, ¶ .2, states that: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "The 'distinctly claiming' requirement means that the claims must have a clear and definite meaning when construed in the light of the complete patent document." *Miles Laboratories,* 997 F.2d at 874–75 (citing *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir.1985)). "The test for definiteness is whether one skilled in the art would understand the bounds of the claim when read in light of the specification." *Id.* at 875 (citing *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,* 806 F.2d 1565, 1576 (Fed.Cir.1986)). "The degree of precision necessary for adequate claims is a function of the nature of the subject matter." *Id.* (citing *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1385 (Fed.Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987)). If a court concludes that a person skilled in the art would not be able to ascertain the bounds of a claim due to substantial ambiguity in its terms, the claim would be invalid for definiteness as a matter of law.

The court need not repeat here the extensive discussion in the preceding section about the evidence of ambiguity in key elements of the claims in issue. The claims of the '852 patent measure the invention at issue for all purposes; thus "the claims must be interpreted and given the same meaning for pur-

poses of both validity and infringement analyses." *SmithKline Diagnostics,* 859 F.2d at 882 (citing *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1121 (Fed.Cir.1985) (en banc)). Given the finding, made above, that there is a real prospect that the court would conclude at trial that persons skilled in the art would perceive important elements of the claims as substantially ambiguous, the court cannot conclude that defendant's attack on the validity of the patent "lacks substantial merit."

But ambiguity is not the only ground for attacking the validity of the '852 patent which appears, at this stage in the proceedings, to have substantial merit. Radius alleges that the technology described in the '852 patent had already been invented by Apple, i.e., that Apple had priority of invention under 35 U.S.C. § 102(g) and therefore that the invention described in the '852 patent was anticipated.[11]

Section 102(g) provides that a patent shall not issue where:

> before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of the one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

"It is axiomatic that for prior art to anticipate under § 102 it has to meet every element of the claimed invention." *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1379 (Fed.Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987) ("*Hybritech* ").

Resolution of the priority of invention issue requires the trier of fact first to

---

**11.** The court notes that Radius has not advanced an argument that the invention in the '852 patent was anticipated in the meaning of 35 U.S.C. § 102(b). Presumably this is because—although Radius claims that the invention was completely described in the Apple/Touchstone documents more than one year prior to the application for

the '852 patent—the Apple documents did not constitute a "printed publication" due to their generally confidential, in-house nature. *See, e.g., Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 936–37 (Fed.Cir.1990) (document(s) must be "generally available" to be a "printed publication").

determine the date by which the alleged prior invention was conceived.

The conception of the invention consists in the complete performance of the mental part of the inventive act. All that remains to be accomplished, in order to perfect the act or instrument, belongs to the department of construction, not invention. It is therefore the formation, in the mind of the inventor, *of a complete and operative invention, as it is thereafter to be applied in practice,* that constitutes an available conception within the patent law.

*Mergenthaler v. Scudder,* 11 App.D.C. 264, 276 (1897), *quoted in Coleman v. Dines,* 754 F.2d 353, 359 (Fed.Cir.1985) (emphasis in *Mergenthaler*); *Hybritech,* 802 F.2d at 1375. The party must show that every feature and limitation of the anticipated invention was conceived by the prior inventor at the time of the alleged prior conception. *Coleman,* 754 F.2d at 359. "Conception must be proved by corroborating evidence which shows that the inventor disclosed to others his 'completed thought expressed in such clear terms as to enable those skilled in the art' to make the invention." *Id.* (quoting *Field v. Knowles,* 183 F.2d 593, 601, 37 CCPA 1211 (1950)).

The trier of fact must then determine the date by which the invention was reduced to practice, either actually or constructively. "Actual reduction to practice requires a showing that 'the embodiment relied upon as evidence of priority actually worked for its intended purpose.'" *DSL Dynamic Sciences Limited v. Union Switch & Signal, Inc.,* 928 F.2d 1122, 1125 (Fed.Cir.1991) (quoting *Newkirk v. Lulejian,* 825 F.2d 1581, 1582 (Fed.Cir.1987)). The performance of tests to determine if an invention will work can be sufficient to establish reduction to practice, as long as the testing conditions are sufficiently similar to those of the intended environment for the invention. *Id.* "[T]here is certainly no requirement that an invention, when tested, be in a commercially satisfactory stage of development in order to reduce the invention to practice." *Id.* at 1126 (citing *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 861 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986)). Constructive reduction to practice, on the other hand, occurs when a patent application is filed on the claimed invention. *Hybritech,* 802 F.2d at 1375.

Where the prior inventor was first to conceive but was last to reduce the invention to practice, the trier of fact must determine whether the alleged prior inventor was reasonably diligent in his efforts to reduce his invention to practice—beginning at a point before the later inventor conceived his invention.

Finally, the trier of fact must determine whether the prior inventor ever "abandoned, suppressed, or concealed" the prior invention.

These are demanding requirements—made even more formidable by the requirement that a defendant challenging validity establish the facts necessary to a finding in its favor by clear and convincing evidence. Even with these considerations in mind, however, the court cannot conclude that plaintiff has shown that defendant's anticipation defense "lacks substantial merit."

If it were determined at trial that it really was significant to the invention claimed in the '852 patent that the speed or rate at which data flowed into the pixel buffer be different from the speed or rate at which data left the pixel buffer, defendant would fail to establish prior invention or conception—in part because defendant has denied that differences in these rates are of any consequence or in any meaningful sense exist within the product contemplated in the Touchstone architecture. But, for reasons explained at length in the preceding section, the court has concluded that it is unlikely that it will be determined at trial that data flow rates really were significant to the invention claimed in the '852 patent.

Similarly, if it were determined at trial that it really was significant to the invention claimed in the '852 patent that the digitized video signal be *stored* in the frame buffer at any scan rate, or *stored* there at a scan rate that is different from the scan rate at which the digitized video signal was *stored* in the pixel buffer (as the language of the claims literally indicates), defendant would fail to establish prior invention or conception—in

part because defendant has argued that the whole concept of "storing" digitized video signal data *at a scan rate* (any rate) is incomprehensible (suggesting that the engineers who designed the architecture for the Touchstone project would never have thought about "rates" at which data would be "stored"), and in part because defendant insists that the Touchstone design contemplated a process in which **simultaneously** the digitized video signal data that was being stored (at no "rate") in the frame buffer would be **read** ('photographed') and **mobilized** ('converted') for transmission to the computer monitor at a raster scan rate appropriate for the computer monitor—and faster than the raster scan rate that would be appropriate for display on a conventional television (video) monitor. As also explained in the preceding section, however, the court has concluded that it is highly unlikely that the '852 patent will be construed literally along these lines.

If, as seems appreciably more likely, both (1) the relative speed or rate of data flow into and out of the pixel buffer and (2) the rate at which the video signal was stored in the two buffers are determined at trial not to be significant to the invention claimed in the '852 patent, then defendant has made a substantial showing of anticipation by the Touchstone project.

Radius has presented considerable evidence that engineers at Apple had conceived of all the essential elements of the '852 patent by the end of 1988, more than a year before Mr. Maietta claims to have conceived of his invention. That evidence is both documentary (the so-called Touchstone documents, Exhs. 21–24 to Decl. of Benjamin P. Yung, executed July 4, 1994, filed under seal, and the applications that Apple filed for the '753 and the '348 patents in mid–1990) and testimonial. No fewer than four witnesses affirmed (three in live testimony, one by declaration) that by the end of 1988, Apple had conceived of all the essentials of the technology that is reflected in Radius' Video-Vision™ product—and that that product includes a capacity for per pixel masking using mask RAM. Tr. at II:59–64, 83 (Casey King); Tr. at II:105–07 (Fabrige Quinard);

Tr. at II:137–39, 141–42, 147–48 (Dr. Carr); Yung Decl. at ¶.15. When pressed during his deposition about the level of development of the concepts reflected in the 1988 documents, Mr. Yung insisted that they were "sufficiently complete" to enable engineers skilled in the pertinent arts to build a Touchstone prototype card, but conceded that the task would be difficult. Yung Depo. at 152–53. Pressed again a few minutes later, he testified that "[t]he concept is complete in sufficient details. It is possible for some skilled person or engineers to do it because the implementation have [sic] multiple possible paths." Yung Depo. at 155.

It is in the context of the foregoing evidence that the court must assess the probative power of plaintiff's contention (made principally through the declaration and live testimony of Mr. Maietta) that the documents that Radius introduced do not describe clearly either a control sequencer or how to write software necessary to implement per pixel masking. Having reviewed the 1988 Apple documents and considered the testimony offered by the Radius witnesses, it is not at all clear to the court that the description of the control sequencing function in the documents is not sufficient to satisfy the legal test for conception. It certainly appears (e.g., in the extensive accounts of the Luey–NuBus functions) that these documents contain considerable material related to controlling the flow of data and directives into the frame buffer and to arbitrating mutually exclusive demands for access to that buffer from the two principal sources of such demands. Especially in light of the credible oral testimony about the scope of what is disclosed in these documents, the court cannot find that defendant has not made a substantial showing that the documents disclose control sequencing.

The contention that these documents fail to disclose the software necessary to implement the per pixel mask, which is very clearly disclosed, loses much of its force in light of (1) the fact that the patent in issue fails to disclose such software (Tr. at I:72, 74, 104, II:175 (Mr. Maietta)), and (2) the testimony that writing such software would take a person skilled in the art at the most a couple of

months and might take as little as a few days. Tr. at I:74, 100 (Mr. Maietta); Tr. at II:67–69 (Mr. King).

While Radius has presented substantial evidence in support of its claim of prior conception, the persuasive power of the evidence that would support a finding that Apple reduced the pertinent conception to practice, actually or constructively, before Mr. Maietta reduced his conception to practice is less clear. Mr. Maietta testified that he completed conception of his invention in early 1990 and first had an operating system using the full invention "around May or June of 1990." Tr. at I:26. It was on July 9, 1990, that he first filed the application that eventually resulted in issuance of the '852 patent. Exh. 1 to Maietta Decl., filed under seal April 14, 1994.

At this juncture, Radius has chosen to support its claim that Apple reduced its conception to practice primarily through the testimony (by way of declaration and deposition) of Mr. Yung, who was not present at the hearing on this motion, apparently because he was out of the country. Mr. Yung was the project manager for Touchstone from late 1988 until early 1990, when Steve Wasserman assumed the project manager role. Yung Depo. at 65–66. Yung states in his Declaration that "the Touchstone architecture had been sufficiently tested" by late 1989 "to ensure that it would operate as intended." Yung Decl. at ¶.15. In his deposition, however, Mr. Yung stated that the Apple engineers had not developed a full prototype of the Touchstone concept until the fall of 1990—almost a year after the allegedly sufficient "testing" of all the key components of the architecture. Moreover, it is clear from reading all of the transcript of Mr. Yung's deposition that the development of Touchstone was quite evolutionary, progressing in non-linear fashion over a considerable period and involving significant contributions from several different engineers or groups of engineers working in loosely integrated and only roughly contemporaneous tracks. Mr. Yung's testimony also supports an inference that there was no precisely fixable date on which he or a group of engineers stood back from the project and made a definite judgment that it would operate as designed. Rather, his testimony gives the impression of constant revision and re-testing of numerous partial prototypes and ASIC simulations, a process through which the engineers gained on different time tables for different pieces of the project progressively greater levels of confidence in functionality. In this way levels of confidence in the project as a whole grew. This portrait seems quite realistic—but makes it more difficult to predict how the trier of fact will resolve the dispute about when Touchstone was actually reduced to practice.

On the other hand, RasterOps has been able to offer virtually no evidence to contradict Mr. Yung's assertion that "[b]y the end of 1989, the Touchstone architecture had been sufficiently tested … to ensure that it would operate as intended." Moreover, under the applicable law, it is possible to reduce an invention to practice before completing development of a fully operational prototype. And Mr. Yung testified in his deposition that the detailed engineering specifications for Touchstone had been developed by the end of 1989. Yung Depo. at 106. Given all these considerations, the court is not satisfied that RasterOps has shown that Radius' contention that the Touchstone concept had been reduced to practice by late 1989 or very early 1990 lacks substantial merit.

The court reaches a different conclusion, however, with respect to Radius' insistence that Touchstone was constructively reduced to practice when Apple filed applications for its '348 and '753 patents on May 24, 1990. In his Declaration, Mr. Yung stated that the '753 and '348 patent applications "disclose the single frame buffer, per-pixel masking architecture of Touchstone." Yung Decl. at ¶.14. Mr. Yung does not say, however, that the two patent applications capture all of the essential elements of the Touchstone concept; instead, he states that the two applications are "related to Touchstone." *Id.* This cautious wording may be attributable to a fact that surfaced for the first time ten days later, at Mr. Yung's deposition. In response to questioning by counsel for RasterOps about his knowledge of the two Apple patents, Mr. Yung admitted that he had "only seen them

cursorily," had "glanced at them," but had "never read through either one of them." Yung Depo. at 155, 158. This shortfall in the basis for Mr. Yung's opinions undermines appreciably the evidentiary value of the views he expressed in his Declaration about the relationship between the Apple patents and the Touchstone project.

For RasterOps, Mr. Maietta insists in his Declaration, filed under seal July 29, 1994, that neither of the Apple patent applications discloses a control sequencer or any other circuit-board-incorporated system for controlling/arbitrating the flow of data/instructions to the frame buffer. According to Mr. Maietta, both patents contemplate the control function being performed by the CPU. Given the limited character of the views expressed by Mr. Yung on the relationship between the Apple patents and the Touchstone project, and given the severe limitations on Mr. Yung's knowledge of the patents, the record as thus far developed does not support a conclusion that there is substantial merit to Radius' contention that the Touchstone architecture was constructively reduced to practice by Apple's filing of its '348 and '753 patent applications.

If the trier of fact were to conclude that Radius failed to prove that it reduced Touchstone to practice before the late spring of 1990, Radius would not lose its anticipation defense unless Radius also failed to prove that its efforts to reduce Touchstone to practice were reasonably diligent. Radius has offered to provide the court with the "reams of documentary evidence showing Apple's diligence" that Radius says it has produced to RasterOps. Defendant's Memo. in Opposition, filed under seal July 13, 1994, at 47. In addition to such documentation, Radius relies on the deposition testimony and declaration of Mr. Yung and the live testimony at the hearing of Mr. King, a software engineer on the Touchstone project from early 1990 through the spring of 1991, when Apple decided to put this undertaking out to bid to third party vendors. Mr. Yung and Mr.

King insist that Apple remained committed to the Touchstone project until an upper-level management decision was made, driven by volume efficiency considerations, to move this kind of project to outside vendors. Yung Decl. at ¶.18; Tr. at II:74–75 (Mr. King). Both of these Apple employees also insist that the company worked diligently on Touchstone throughout the project's life at the company. Yung Decl. at ¶.21; Tr. at II:58, 97–98 (Mr. King).

Pressed in his deposition about why it took so long to move the project from conception in late 1988 to the point where it was ready for productization in early 1991, Mr. Yung admitted that the "schedule slipped" (Yung Depo. at 62), but blamed that slippage not on lack of diligence or compromised commitment, but on a constellation of unforeseen setbacks, some related to changes in personnel, some caused by serious problems with CAD tools, and some related to difficulties in building and testing some of the complex chips called for in the project. Yung Depo. at 61–64, 84, 146–47.

RasterOps challenges this explanation and argues that the fact that its engineers were able to move their related projects from conception to reduction to practice in appreciably less time [12] demonstrates that Apple could not have pursued reduction to practice diligently. To satisfy the "reasonable diligence" requirement, however, it is not necessary to show that an inventor moved from conception to reduction to practice in the shortest possible time, or as quickly as another inventor did. The "reasonable diligence" standard requires the trier of fact to consider all the pertinent circumstances—in light of the policy that drives this norm. And while it seems clear that Apple could have moved this project along faster by diverting additional resources to it from other product development work, Mr. Yung's deposition testimony, viewed in its entirety, creates an impression of a project to which Apple committed considerable resources over

12. Mr. Maietta testified that he and co-workers had developed one major component of their invention by January of 1990; while it is obvious that getting to that point took some time, how much time has not been made clear. Mr. Maietta further testified that it took an additional five to six months, from January to May or June of 1990, to develop an operational system that included all the essential elements of the invention. Tr. at I:26.

a sustained period. His account portrays an extremely complex project to which many different engineers, with different areas of expertise, made substantial contributions, a project that included multiple series of progressively more demanding analyses and tests for many different components, development of separate prototypes for 20 or so such components, as well as micro-adjustments in design and in selection of components made necessary by market constraints. While his account certainly supports an inference that set-backs and slow-downs were experienced, and that sometimes personnel resources that could have been committed to this work were directed to other matters, the essential impression created by Mr. Yung's testimony is that Apple relatively continuously directed substantial energy and material to Touchstone from its conception through early 1991, when management decided to bid the project out. If credited by the trier of fact, this testimony could support a finding that Apple pursued reduction to practice with reasonable diligence. Thus the court cannot say, on this record, that Radius' contention that Apple proceeded with reasonable diligence lacks substantial merit.

Finally, we point out that the record offers no meaningful evidentiary support for an inference that Apple abandoned, concealed, or suppressed (as those terms are defined in this legal context) the Touchstone technology.

As the discussion over the preceding pages makes clear, the court is constrained to conclude that RasterOps has failed to show that Radius' challenge to the validity of the '852 patent lacks substantial merit. Like the court's findings in the preceding section on the infringement issue, this conclusion provides strong support for Radius' opposition to the motion for a preliminary injunction.[13]

### 3. Enforceability

Radius also makes arguments that the '852 patent is unenforceable due to RasterOps' alleged inequitable conduct before the PTO and RasterOps' alleged misuse of the patent in this litigation and in the SuperMac settlement. In light of the fact that plaintiff has failed to persuade the court that it is likely to prevail at trial on the infringement and validity issues, however, this is not an appropriate occasion for addressing these arguments.[14]

### B. *Irreparable Harm*

Because the '852 patent has not yet been tested in litigation and because plaintiff failed to make a "clear showing" in this proceeding that it is likely to succeed at trial on the issues of infringement and validity, RasterOps is not entitled to a presumption of irreparable harm. *Nutrition 21*, 930

---

**13.** We note that Radius presses three additional attacks on the validity of the '852 patent: (1) that even if the technology described in the '852 patent was not anticipated entirely by Touchstone, the differences between the invention covered by the '852 patent and prior art would have been obvious to one skilled in the art at the time of the invention, i.e., the subject matter of the '852 patent was not non-obvious under 35 U.S.C. § 103; (2) that the inventors intentionally concealed the best mode of carrying out the invention described in the '852 patent, i.e., the specification fails to set forth the best mode contemplated by the inventor in violation of 35 U.S.C. § 112, ¶.1; and (3) that the '852 patent fails to provide the information necessary to enable a person skilled in the art to make and use the invention it claims, i.e., the specification does not provide the full, clear, concise, and exact enabling disclosure required under 35 U.S.C. § 112, ¶.1.

In light of the findings articulated in the preceding pages with respect to validity—based on the substantial ambiguity of the patent's terms and likely anticipation by Touchstone—at this time we do not find it necessary to consider at length Radius' additional attacks on the patent's validity. We do feel compelled to note, however, that it is not obvious to us that these attacks are entirely without persuasive force. One reason for this is that RasterOps, for reasons known only to it, did not squarely address the § 112 issues (best mode and enablement) either by argument in its reply papers or with substantial evidence. Rather, as to both of these issues, RasterOps offered the court a total of only two pages of conclusory argument in its post-hearing written statement and approximately four thin pages of testimony from Mr. Maietta (Tr. at I:48–52).

**14.** Again—as with Radius' best mode and enablement attacks on the patent's validity—we note that for reasons known only to RasterOps, RasterOps declined to reply to Radius' enforceability arguments in any meaningful sense (e.g., less than one page in RasterOps' post-hearing statement).

F.2d at 871. Moreover, "neither the difficulty of calculating losses in market share, nor the speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial." *Id.* A plaintiff must proffer "[s]ome evidence and reasoned analysis" about the inadequacy of monetary damages in order to establish irreparable harm.[15] *Id.* at 872.

■ Given defendant's substantial showings on the infringement and validity issues, this court could responsibly consider issuing a preliminary injunction in this setting only if plaintiff made a truly *extraordinary* showing of irreparable harm.[16] RasterOps has made no such showing. In fact, there appears to be little likelihood that RasterOps will suffer anything fairly characterizable as "irreparable" harm if the court does not issue the preliminary injunction.

RasterOps knew about Radius' allegedly infringing technology by no later than mid–1993 (probably much earlier, perhaps in 1991 when Apple gave RasterOps an opportunity to bid on the Touchstone project) and publicly accused Radius of infringing in October of that year. Yet RasterOps waited until mid–April of 1994 to file the instant motion for preliminary injunction. While a delay of that length might be of less significance in some settings, it is quite surprising in a case like this, where RasterOps' president has insisted that the entire market life for the kinds of products in issue here is often only 18 to 24 months (Tr. at I:112) and that "market share is everything in this business [a]nd you have to take advantage of it very, very quickly." Tr. at I:118. Judged by plaintiff's own submissions, a six to eight month delay in seeking relief could cost plaintiff between 25% and 45% of the direct value of its invention. Thus, waiting to act for this period seems inconsistent with the notion that RasterOps will suffer irreparable harm if the preliminary injunction does not issue.

The court also notes that when it settled its suit against SuperMac, RasterOps gave that competitor permission to continue to make and market its allegedly infringing products for more than six additional months.[17] Although we acknowledge squarely that delay, standing alone, is not sufficient to refute plaintiff's assertion of irreparable harm,[18] the delays described here appropriately give the court cause for some skepticism.

RasterOps has introduced evidence which it hopes will persuade the court that products arguably covered by the '852 patent have played and could play a major role in RasterOps' overall economic health—and that Radius' introduction of allegedly infringing products has caused a precipitous decline in sales by RasterOps of competing goods. The relevant evidence, however, fails to offer substantial support for these propositions. When cross-examined during the hearing, Mr. Smith, whose testimony generally lacked specificity and consistency, ended up admit-

15. RasterOps suggests that the appropriate framework for analysis of the irreparable harm issue is reflected in *Hybritech, Inc. v. Abbott Laboratories, supra.* In that opinion the Court of Appeals listed nine factors that the district court had considered in conducting its analysis of the irreparable harm question. The Court of Appeals presented this list to show that the district court had not merely relied on a presumption of irreparable injury stemming from abstract principles about the economic importance of protecting legitimate patent rights. The Court of Appeals did not state that other courts should include these factors in their irreparable harm analyses, even in similar kinds of cases, and certainly did not suggest that irreparable harm analyses might not be influenced substantially by other factors, some possibly much more important than those listed in that district court's decision. In the circumstances presented in the case at bar, we believe the factors to which the court points in the text are sufficient to support the conclusion that RasterOps has not established a substantial likelihood of irreparable harm.

16. *See, e.g., Reebok International,* 32 F.3d at 1556 ("a district court may properly deny a motion for a preliminary injunction simply based on the movant's failure to establish a reasonable likelihood of success on the merits ...").

17. Under the Settlement Agreement, executed March 18, 1994, SuperMac is not required to stop selling the allegedly infringing products until September 30, 1994.

18. *E.g., Abbott,* 849 F.2d at 1457 ("A period of delay is but one circumstance that the district court must consider in the context of the totality of the circumstances.").

ting that only a small percentage of Raster-Ops' revenues is even arguably attributable to sales of products incorporating the patented system. Tr. at I:109–13. In fact, Mr. Smith testified that RasterOps' total annual sales are in the range of $75–80 million, while sales of products incorporating the claimed invention accounted for somewhere between four and seven million dollars during the last four quarters (i.e., between about five percent and nine percent). Tr. at I:109–13, 119–20. And while Mr. Smith claimed from the stand that increasing sales in this product line was extremely important to his company's growth plan, Radius pointed to published reports that RasterOps is shifting its focus to applications on IBM compatible platforms. Moreover, the court finds it very difficult to understand how a product group that accounts for a relatively small percentage of the company's sales and that has a market life of less than two years, *more than half of which already has passed*, could possibly play such a vital role in RasterOps' future.

The evidence that allegedly infringing products manufactured by Radius caused RasterOps to lose significant sales and market share also was of dubious persuasive power. Because RasterOps elected, after filing its motion, but before the hearing, not to try to establish at this juncture that Radius' VideoVision™ product, without the daughter card, infringed the '852 patent, all the evidence RasterOps presented about the history of its sales prior to introduction of Radius' VideoVision Studio™ (which included the enabling daughter card) is irrelevant.

Mr. Smith testified that RasterOps' sales of products covered by the '852 patent declined by "about three/fourths" in the first two quarters after Radius introduced Video-Vision Studio™ in mid–1993. Tr. at I:114. Unfortunately, this testimony is directly contradicted by other evidence submitted by RasterOps, most obviously the sales data reported in Exhibit 3 to the Declaration of James P. Renalds, filed under seal April 14, 1994. That exhibit, which RasterOps used in an enlarged form during the hearing, reports that sales of RasterOps' products allegedly covered by the patent in suit declined from just over two million dollars to just over $1.3 million (on a quarterly basis) during the first two quarters after introduction of VideoVision Studio™. That is a decline of about 35%, a far cry from the 75% claimed on the stand by Mr. Smith.

Moreover, even evidence introduced by RasterOps creates a real question about whether the drop in sales was *caused* by the introduction of VideoVision Studio™. Raster-Ops adduced no direct evidence of such causation. Perhaps more important, the suggestion that we infer such causation is undercut by the evidence about what happened to RasterOps' sales after the introduction of the only other accused product, SuperMac's Digital Film. The sales summaries introduced by RasterOps show that sales of its covered products actually *increased* in the two quarters after SuperMac introduced its allegedly infringing product from about $1.66 million to just over two million dollars, an increase of some 17%.

The causation questions raised by this evidence are intensified by the fact that a press release that RasterOps issued in October of 1993 to explain why its sales (company wide) had dropped upwards of 20% for the first quarter of fiscal 1993 *did not even mention Radius* or its allegedly infringing product. Instead, the press release blamed the drop in sales primarily on "delays in the introduction of new products ... and continued softness in European markets." Exh. 10 to Decl. of Howard Freedland, filed July 5, 1994. RasterOps might attempt to explain this omission by arguing that the $600,000 drop in sales (for the quarter in issue) that it attributes here to VideoVision Studio™ did not represent a large enough percentage of the company-wide sales drop-off to warrant mentioning; but any such argument would contradict RasterOps' contentions about the importance to it of the product lines allegedly covered by the '852 patent.

In sum, RasterOps' showing falls substantially short of persuading the court that it will suffer irreparable harm if the court declines to issue the preliminary injunction.

### C. Equitable Factors—Balance of Harms & Public Interest

The Federal Circuit has recently held:

> Because, irrespective of relative or public harms, a movant must establish both a likelihood of success on the merits and irreparable harm ... the district court may deny a preliminary injunction based on the movant's failure to establish either of these two crucial factors *without making additional findings respecting the other factors....* While a district court must consider all four factors before granting a preliminary injunction to determine whether the moving party has carried its burden of establishing each of the four, we specifically decline today to require a district court to articulate findings on the third and fourth factors when a court denies a preliminary injunction because a party fails to establish either of the two critical factors.

*Reebok International Ltd.*, 32 F.3d at 1555 (emphasis added). Because the court finds that RasterOps has failed to establish *both* of the crucial factors, and therefore *cannot* grant the requested injunction, the court declines to make findings on the third and fourth factors.

### III. CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction hereby is DENIED.

IT IS SO ORDERED.